**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE R.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  19 C 1882** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Jose R. ("Claimant")[1] brings a motion for summary judgment to reverse the

final decision of the Commissioner of Social Security ("Commissioner") that denied his

application for child insurance benefits, a period of disability, and disability insurance benefits

("DIBs") under the Social Security Act.  42 U.S.C. §§416(i), 402(e), and 423.  The parties have

consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C.

§636(c).  Claimant has filed a motion for summary judgment, and the Commissioner has filed a

cross-motion.  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and

1383(c)(3).  For the reasons stated below, Claimant's motion for summary judgment (Dckt. #15)

is granted, and the Commissioner's motion (Dckt. #22) is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social
Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.
Thereafter, we shall refer to Jose R. as Claimant.

## I. BACKGROUND

### A. Procedural History

On August 4, 2015, Claimant filed a disability application alleging a disability onset date of July 1, 2013. His claim was denied initially and upon reconsideration. On December 27, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on February 2, 2019, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court on March 19, 2019.

### B. The Social Security Administration Standard To Recover Benefits

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that

must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### C. The Evidence Presented to the ALJ

The administrative record contains the following relevant evidence that bears on the issues presented by Claimant's appeal.

### 1. Evidence From Claimant's Treatment History

Claimant suffers from an epileptic condition that is secondary to a brain tumor. He experienced his first epileptic seizure in November 2010, which led to the discovery of the tumor. Due to its position in the brain, however, the tumor could not be completely removed. The record evidence of events begins on September 7, 2011, when Claimant was admitted to the ER after he was found unresponsive on the floor of a library. A CT scan of the head did not reveal significant abnormalities, but an EEG showed sharp temporal-lobe waves that were

consistent with a seizure. Claimant had been taking 500 mg. of the anti-seizure medication Keppra but was advised to increase the dosage to 1000 mg. daily. (R. 417).

Claimant stated that he was not always aware of having seizures, and the record contains relatively sporadic information about them. He told Dr. Vikram Prabhu in November 2012 that he had not had a seizure since December 2011. (R. 490). A partial seizure was noted in August 2013 after the dosage of Keppra had again been doubled to 2000 mg. a day. Neurologist Dr. Jorge Asconape noted that Keppra had caused danger-control issues for Claimant.[2] (R. 503). Another seizure occurred in May 2014, and in June 2015 Claimant was again taken to the ER for a generalized tonic-clonic convulsion. Claimant told the treating physician that he had been taking Keppra only once a week instead of daily. (R. 454). Claimant was released but began experiencing an "impairment of consciousness" the next day that included hitting himself and "gesticulating vigorously." (R. 541). Dr. Asconape noted that Claimant was experiencing headaches, difficulties with his short-term memory, and problems with anger control due to Keppra. (R. 541-42). Dr. Asconape repeated these concerns in January 2016 when he noted that Claimant continued to complain of memory problems, light headedness, and anger issues. As a result, he recommended that Claimant begin tapering off of Keppra. (R. 719).

On January 26, 2016, Claimant was referred to Dr. Antonio Pangan. Dr. Pangan noted that Claimant was experiencing headaches every day at a pain level of 8 out of 10. These headaches had worsened from a former frequency of once or twice a week. Claimant told Dr. Pangan that he was having "big issues" with his memory and even forgot things while he was cooking. (R. 570-72). Dr. Pangan was concerned with Claimant's memory and psychological

---

[2] Anger is a recognized side effect of Keppra. *See* https://www.drugs.com/tips/patient-keppra-tips ("Keppra may also cause behavioral problems such as aggression, anxiety, irritability, and nervousness") (last visited May 4, 2021).

4

status and referred him for a neuropsychiatric exam.  Claimant was unable to follow through with the recommendation, however, because of problems with his insurance.

By February 2016, Claimant stated that he felt like he was going to "fall over" during normal walks and was fatigued.  His mother also told his provider that Claimant's memory was "failing" but that the severity of his headaches had declined.  Despite the earlier recommendation to stop Keppra, it was still being prescribed in modified dosages; in April, Dr. Asconape noted that Claimant's mood had "mellowed" but that he was having occipital headaches every other day that lasted three to four hours.  (R. 726).  By August 2016, Dr. Asconape stated that Claimant was having daily episodes of nausea, dizziness, and head pain.  He also noted that Claimant and his mother stated that his "memory continues to decline."  (R. 733).  Dr. Asconape wanted to admit Claimant to the hospital for a continuous EEG study, but Claimant declined.  Anger issues were again cited in April 2017, and Claimant continued to have issues with blurred vision and dizziness.  Dr. Asconape also noted "anorexia and weight loss" that were likely the side effects of another antiseizure medication – Topamax – that had been added to Keppra and Lamictal.  (R. 744).  One of the last entries dated May 22, 2017 stated that Claimant was "doing terribly" and had had a seizure the day before.  (R. 747).

### 2. Evidence From the State-Agency Experts

On March 30, 2016, non-examining expert Dr. Richard Bilinsky issued a report for the SSA.  Dr. Bilinsky found that epilepsy constituted a severe impairment, but that Claimant's brain tumor was non-severe.  These impairments did not limit Claimant's exertional abilities according to Dr. Bilinsky, who found that Claimant could work at all exertional levels with an unlimited ability to climb stairs, balance, stoop, kneel, and crawl.  He could never climb ladders or

scaffolds, however, or have concentrated exposure to hazards such as heights or machinery. (R. 165-67).

On March 18, 2016, state-agency psychologist Dr. Erika Gilyot-Montgomery issued a report concerning Claimant's mental RFC. She found that Claimant suffered from a severe organic mental disorder and an affective disorder. Using the functional domains that formerly applied to the listings' Paragraph B factors,[3] Dr. Gilyot-Montgomery found that Claimant had "moderate limitations in sustained concentration, persistence, pace, stress tolerance & adaptability." (R. 135). In particular, she concluded that Claimant was "[m]oderately limited" with respect to the ability to: (1) understand and remember detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform a consistent pace without an unreasonable number and length of rest periods. (R. 134-35.) Dr. Gilyot-Montgomery further found that Claimant has limitations regarding "social interaction," "understanding and memory," and "sustained concentration and persistence." (R. 134-35.)

On the other hand, Dr. Gilyot-Montgomery determined that Claimant was "[n]ot significantly limited" regarding a number of other capabilities (such as the ability to understand and remember very short and simple instructions) and that he "retains the capacity for simple 1-3

---

[3] The listings contain three categories for evaluating mental impairments. The Paragraph B factors are used to assess a claimant's functional limitations. Because the ALJ's decision was issued in December 2017, he correctly referenced the new paragraph B criteria that apply to claims filed on, or claims that were pending as of, January 17, 2017. *See* 81 Fed.Reg. 66,138 (Sept. 26, 2016). The old paragraph B factors addressed a claimant's (1) activities of daily living, (2) social functioning, (3) ability to maintain concentration, persistence, or pace, and (4) episodes of decompensation.

step tasks given routine breaks, untimed tasks, infrequent changes in routine & minimal work-related responsibilities."  (R. 135).

Dr. James Gioia, a psychologist, interviewed Claimant on November 5, 2015 at the SSA's request.  Dr. Gioia noted that Claimant was not under the care of a psychiatrist even though he had been diagnosed with depression.  Claimant told the psychologist that he was forgetful and had difficulty walking long distances.  Dr. Gioia found Claimant's speech to be "articulate and comprehensible" but thought that his overall mood was "depressed."  His capacity for insight was limited, and Claimant's judgment was "poor."  Claimant was not oriented to place, and he could not name the city where the exam took place.  He also did not know the names of any recent past presidents or the news of the past few days.  Claimant could only count backwards by sevens for three numbers and was unable to carry out simple multiplication.  Dr. Gioia diagnosed Claimant with a dysthymic disorder.  (R. 556).  Dr. Gioia further found that Claimant's short-term memory was impaired, his interpersonal skills were "rather primitive," and that he was not able to sustain concentration and persistence.  (R. 555-56).

### 3.  Evidence From the Administrative Hearing

Claimant appeared at an administrative hearing on September 6, 2017 and described his symptoms to the ALJ.  Claimant, who was 20 years old as of the alleged onset date of July 1, 2013, told the ALJ that he had been terminated from his prior work as an electronics salesman because he required frequent breaks caused by headaches.  (R. 50).  Claimant expressed particular concern over the effect that eye strain has on him and stated that, although he enjoys video games, he can only play them for short periods before developing a migraine headache. He enjoys movies but transfers them to his computer so that he can listen to them instead of

watching them directly. Claimant becomes light-headed and "cross-eyed" when he stands too long. He can only stand for three to four hours at a time and must then sit for 15 to 20 minutes.

Claimant described daily activities that were significantly limited. He awakens at noon with full-body pain that sometimes requires him to remain in bed until it diminishes. Claimant testified that he has become forgetful, that heat intensifies his symptoms, and that the medication he takes to control his epilepsy has caused him to experience significant levels of anger. He has "gone off" on people without being able to stop himself or to remember what he has done and has hit "dressers, desks, beds, walls, [and] doors" with his fists. (R. 70). Claimant stated that he becomes so depressed that he is unable to leave his home three times a week. His daily activities are further limited by his epilepsy. He is not allowed to cook or to be around heating instruments such as stoves. He also does not have a driver's license. Claimant stated that he does some household jobs like laundry, vacuums "from time to time," and shops for groceries with his mother. Even normal exertion makes him exhausted, and Claimant stated that he could not lift more than 40 pounds at a time without experiencing back pain. (R. 57).

Claimant's mother also testified at the hearing. She stated that Claimant suffers from both full and partial seizures but that their frequency was difficult to assess because she was not always present when they occurred. She confirmed that Claimant's epilepsy medication had made him increasingly angry – he once punched a hole through a door – and that he had also lost 30 pounds since the November hearing. Claimant's mother further stated that he experienced difficulties in caring for himself; he had tried living with friends for a while but was unable to maintain normal hygiene, became "very dirty," and created a "smell" in his apartment. (R. 78, "he needs to, you know, be taken care of [o]r he forgets to [w]ash or take a bath"). Claimant also

frequently forgets to complete tasks or take his medications, and she had to have his epilepsy pills placed in blister packs to make it easier for Claimant to keep track of what he had taken.

## II.    THE ADMINISTRATIVE LAW JUDGE'S DECISION

On December 27, 2017, the ALJ issued a written decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability cases, the ALJ determined at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of July 1, 2013. His severe impairments at Step 2 were epilepsy, depression, and an organic mental disorder. The ALJ assessed two non-severe impairments. The first was back pain evidenced largely by Claimant's own testimony that he could not lift more than 40 pounds at a time. Second, the ALJ noted that Claimant had undergone surgery for a brain tumor in 2011 that did not result in a full resection of the tumor due to its location. The ALJ believed that this condition was well controlled by medication and found that it also constituted a non-severe impairment.

None of Claimant's impairments met or medically equaled a listing at Step 3 either singly or in combination. As part of his Step 3 discussion, the ALJ assessed the severity of Claimant's mental disorders by applying the "special technique" provided under 20 C.F.R. §404.1520a. He found that Claimant had only mild restrictions in the functional areas of understanding, remembering, or applying information and in interacting with others. A moderate restriction was present in concentration, persistence, or pace. The ALJ found no restriction in the fourth domain of adapting or managing oneself.

Before moving to Step 4, the ALJ considered the expert reports issued by the state-agency medical experts. He adopted the opinion of psychologist Dr. Gilyot-Montgomery, who had found that Claimant had mild restrictions in his ADLs and social functioning, a moderate

limitation in concentration, persistence, or pace, and had experienced no episodes of decompensation. No treating expert submitted a report, and the ALJ did not assign a weight to the opinion of examining psychologist Dr. Gioia. The ALJ also gave great weight to the report and RFC assessment of Dr. Bilinsky and found that Claimant's descriptions about the severity and frequency of his symptoms were not "entirely consistent" with the record. (R. 29).

Based on these findings, the ALJ concluded that Claimant had an RFC that would enable him to perform a full range of work at all exertional levels as long as several nonexertional restrictions were applied. In particular, Claimant could not climb ladders, ropes, or scaffolds; he must avoid concentrated exposure to heat, dangerous machinery, unprotected heights, and computer work. He was limited to "simple, routine and repetitive tasks . . . in a work environment free of fast paced production requirements; involving only simple, work-related decisions; and with few, if any, work place changes." (R. 28). Claimant did not have any past relevant work at Step 4.

To facilitate his analysis at Step 5, the ALJ posed the following hypothetical question to the vocational expert ("VE"):

> Assume a hypothetical individual, 20 years of age . . . with a GED and really no
> past relevant work. There would be no exertional limitations but there should be
> no climbing of ladders, ropes or scaffolds. Avoid concentrated exposure to
> extreme heat. Avoid concentrated exposure to dangerous machinery as well as
> unprotected heights. Work would be limited to simple, routine repetitive tasks
> performed in a work environment free of fast-paced production requirements
> involving only simple work-related decisions and with few, if any, workplace
> changes. Are there any medium, unskilled jobs such an individual would be able
> to perform in the national economy?

(R. 81.) The ALJ followed up by asking the VE to assume the above limitations and that there could be no computer work involved in performing the job. (R.82). In answer to both hypotheticals, the VE testified that there would be medium, unskilled jobs available in the

national economy for persons with such limitations. (R. 81-82.) Based on the RFC and the

testimony of the VE, the ALJ determined at Step 5 that jobs existed in the national economy that

Claimant would be able to perform. The ALJ therefore determined at Step 5 that Claimant was

not disabled.

## III.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final

decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C.

§405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial

evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir.

2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks

omitted). The Commissioner's decision must also be based on the proper legal criteria and be

free from legal error. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart,*

290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by

reweighing the facts, resolving conflicts, deciding credibility questions, by making independent

symptom evaluations, or by otherwise substituting its judgment for that of the Commissioner.

*McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th

Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical

bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

This requirement is designed to allow a reviewing court to "assess the validity of the agency's

ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d

589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## IV. ANALYSIS

Claimant urges this Court to reverse and remand the ALJ's decision to deny him an award of benefits based on a number of arguments. Among other things, Claimant asserts that the ALJ erred by: (1) failing to fully incorporate his limitations into his RFC and the hypothetical questions that the ALJ posed to the vocational expert; and (2) failing to properly weigh and evaluate the opinion of consulting psychologist Dr. Gioia. Because the Court agrees that remand is necessary for these issues, it will not address the remaining substantive arguments raised by Claimant.[4] *See, e.g., DeCamp v. Berryhill,* 916 F.3d 671, 676 (7th Cir. 2019).

### A. The ALJ Erred By Failing To Fully Incorporate Claimant's Limitations Into His RFC And The Hypothetical Questions That He Posed To The VE

As explained above in Section C(2), Dr. Gilyot-Montgomery found that Claimant had a number of moderate limitations in sustained concentration, persistence, pace, stress tolerance and adaptability. The ALJ adopted Dr. Gilyot-Montgomery's opinion and expressly found that Claimant has a "moderate limitation" with "regard to concentrating, persisting, or maintaining pace." (R. 27). Nonetheless, the ALJ did not mention the specifics of the moderate limitations that Dr. Gilyot-Montgomery determined Claimant to have in either his RFC or the hypothetical

---

[4] The Court does order the ALJ to address one additional matter on remand. Claimant presented three claims to the ALJ involving child insurance benefits, disability insurance benefits, and supplemental security income. As the Commissioner explains, these claims involve different starting and ending dates that collectively span the period of July 1, 2013 through December 27, 2017. The ALJ, however, only assessed an RFC for the period "prior to [Claimant] attaining age 22," (R. 28), which the Commissioner identifies as October 18, 2014. Claimant argues that the ALJ erred by not addressing the entire relevant period, but the Commissioner counters by asserting that the ALJ's phrasing of his RFC finding was – at worst – merely a "typographical error." Since this case already requires remand, the ALJ is directed to clarify how his opinion addresses the periods related to the three claims at issue in this case.

questions that the ALJ posed to the VE. Instead, the RFC and hypothetical questions formulated by the ALJ purported to encapsulate Claimant's limitations by stating that his "[w]ork would be limited to simple, routine repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes." (R. 81, 28). This was error.

The Seventh Circuit has repeatedly held that "'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record.'" *Varga v. Colvin,* 794 F.3d 809, 813 (7th Cir. 2015), *quoting Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014); *Winsted v. Berryhill,* 923 F.3d 472, 476-77 (7th Cir. 2019); *DeCamp,* 916 F.3d at 675-76; *Mischler v. Berryhill,* 766 Fed.Appx. 369, 375-77 (7th Cir. 2019); *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 619-21 (7th Cir. 2010); *Moreno v. Berryhill,* 882 F.3d 722, 730 (7th Cir. 2018); *Young v. Barnhart,* 362 F.3d 995, 1002-05 (7th Cir. 2004). Where – as here – mental impairments are at issue, a claimant's RFC and the hypothetical questions must account for claimant's "moderate limitation[s] of concentration, persistence, and pace." *See, e.g., Varga,* 794 F.3d at 814; *Winsted,* 923 F.3d at 476; *Moreno,* 882 F.3d at 730; *Young,* 362 F.3d at 1002-03.

The "most effective way to ensure that the VE is apprised of the claimant's limitations is to include all of them directly in the hypothetical." *O'Connor-Spinner,* 627 F.3d at 619 (citing cases); *Moreno,* 882 F.3d at 730. Indeed, "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner,* 627 F.3d at 620-21; *DeCamp,* 916 F.3d at 675 ("The ALJ must explicitly account for all a claimant's limitations in

her hypothetical, including limitations in concentration, persistence, or pace, unless the vocational expert has independently reviewed the medical record").  A court will not presume that the VE is apprised of any of claimant's limitations aside from those identified in the hypothetical questions unless the VE has independently reviewed the medical record.  *Varga,* 794 F.3d at 814.  There is no indication that the VE independently reviewed the medical record in this case and the Court will not presume that he did in view of the fact the ALJ asked him a series of self-contained hypothetical questions with increasingly debilitating limitations.  *See O'Connor-Spinner,* 627 F.3d at 619; *Young,* 362 F.3d at 1003.

Although there are no magic words which must be used,[5] the hypothetical questions that the ALJ asked the VE – which limited Claimant to "simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions and with few, if any, workplace changes" (R. 81) – did not adequately capture Claimant's moderate difficulties with concentration, persistence, and pace. *See, e.g., Varga,* 794 F.3d at 814 ("we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.") (internal quotation marks omitted); *Mischler,* 766 Fed.Appx. at 375-76; *Moreno,* 882 F.3d at 730; *see also Kennedy v. Saul,* 418 F.Supp.3d 314, 328 (W.D.Wis. 2019) (holding that an RFC which included a restriction on "fast paced production" failed to reflect the physicians' restriction to "untimed tasks").  As the Seventh Circuit observed, "[t]hough particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with

---

[5] For example, contrary to Claimant's assertion, the ALJ's RFC and hypothetical questions were not flawed simply because he failed to explicitly incorporate Dr. Gilyot-Montgomery's opinion that Claimant was capable of simple one-to three step tasks. *See Surprise v. Saul,* 968 F.3d 658, 662-63 (7th Cir. 2020).

concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and hypothetical question." *Winsted,* 923 F.3d at 476 (emphasis in original).[6]

By the time the ALJ reached Step 5 of the analysis, "the entire finding of disability or no disability hinged on the validity of the hypothetical question." *Young,* 362 F.3d at 1005. Where – as here – "the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by the medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." *Id.*; *Moreno,* 882 F.3d at 730. Accordingly, remand is warranted for this reason standing alone. *Id.*

### B. The ALJ Erred by Failing to Properly Evaluate and Weigh Dr. Gioia's Report

The ALJ in his decision did not assign a weight to consulting psychologist Dr. Gioia's November 5, 2015 psychological report notwithstanding the fact that Dr. Gioia tested and evaluated Claimant in person. (R. 555-57). This was error because it is well established that "the ALJ must explain the weight given to the consulting physician's opinion." *Turner v. Berryhill*, 244 F.Supp.3d 852, 859 (S.D.Ind. 2017) (citing 20 C.F.R. §404.1527(e)(2)); *see also Carolyn S. v. Saul*, No. 19 C 385, 2020 WL 231085, at *5 (N.D.Ill. Jan. 15, 2020); *Dorion v. Colvin*, No. 13 C 4721, 2015 WL 2398405, at *2 (N.D.Ill. May 18, 2015). The only time an ALJ

---

[6] The Commissioner relies on a number of inapposite decisions. (*See* Dckt. #23 at 9). For example, in *Dudley v. Berryhill,* 773 Fed.Appx. 838 (7th Cir. 2019), the Seventh Circuit held that the claimant's greatest limitations, which were "stress- and panic-related," were adequately addressed by the RFC. *Id.,* at 842; *see also Pytlewski v. Saul,* 791 Fed.Appx. 611, 616 (7th Cir. 2019) (hypothetical question adequately captured claimant's "stress- or panic-related" limitations). In another case, the ALJ gave great weight to the opinion of a physician and – unlike here – the physician's "limitations were given to the vocational expert." *Burmester v. Berryhill,* 920 F.3d 507, 511-12 (7th Cir. 2019); *see also Saunders v. Saul,* 777 Fed.Appx. 821, 825 (7th Cir. 2019) (the ALJ relied on a physician's testimony to assess claimant's limitations and "she appropriately included in her hypothetical question to the VE all of the doctor's proposed limitation that she found to be supported by the record"). In the last case, the claimant had fewer limitations than the Claimant in this case and the limitations he did have were adequately accounted for by the RFC. *See Jozefyk v. Berryhill,* 923 F.3d 492, 497-98 (7th Cir. 2019).

is exempt from this requirement is when she gives controlling weight to a treating source, which does not apply in this case. *See* 20 C.F.R. §416.927(e). The weight given to an expert report must also be specific instead of implied. *David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006); *Turner*, 244 F.Supp.3d at 859. Furthermore, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record." *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003).

Notwithstanding this, the Commissioner asserts that the two references that the ALJ made to Dr. Gioia's report in his decision were a sufficient assessment of the report. The Court disagrees. In the first reference, the ALJ noted that Dr. Gioia diagnosed Claimant with dysthymic disorder on November 5, 2015[7] and juxtaposed that finding against records from Claimant's July 22, 2015 annual check-up with his primary care physician which noted that Claimant had an "appropriate affect and demeanor" and was negative for depression (R. 466, 469) and records from Claimant's January 26, 2016 physician's examination which confirmed that Claimant had dysthymic disorder but noted that it was "stable." (R. 576, 722).

These records do not, at least without explanation, provide a basis to discount Dr. Gioia's report. Dr. Gioia (who also found that Claimant's "overall mood appears to be depressed") is an expert in assessing psychological disorders, however, and the ALJ needed to explain why a non-expert's passing reference to depression as part of a physical exam should be credited over Dr. Gioia's findings. This is particularly so given that the finding of the primary care physician is at odds with the ALJ's *own* finding at Step 2 that depression was a severe impairment for Claimant. (R. 25). The ALJ further reasoned that Claimant's mental impairment was not as serious as he

---

[7] Dysthymic disorder is "'a chronically depressed mood that occurs for most of the day more days than not for at least 2 years.'" *Plum v. Astrue,* No. 08-CV-6121-HU, 2009 WL 3627966, at *19 (D.Or. Oct. 29, 2009), *quoting* DSM IV-TR at p. 376.

alleged because another provider found that his dysthymic disorder was "stable."  That overlooks that "a person can have a condition that is both 'stable' and disabling at the same time." *Hemminger v. Astrue,* 590 F.Supp.2d 1073, 1081 (W.D.Wis. 2008); *see also Randi R. W. v. Comm. of Soc. Sec.*, 421 F.Supp.3d 616, 623 (N.D.Ind. 2019) (same).

The ALJ's second reference to Dr. Gioia's report was at Step 3 as part of the Paragraph B discussion concerning concentration, persistence, or pace.  (R. 27).  The ALJ noted that Dr. Gioia had concluded that Claimant was incapable of "sustained concentration and persistence" and cited two of Dr. Gioia's conclusions – namely, that Claimant could repeat four digits forwards and three backwards and had an impaired short-term memory.  (R. 27).  The ALJ then appears to have discounted Dr Gioia's findings based on his observation that:  "claimant is able to go out by himself without getting lost and play[] video games, which requires concentration . . . Claimant was also able to follow the hearing and answer questions appropriately.  He has the CPMP to do activities of daily living including prepar[ing] food, vacuum[ing], go[ing] out and [doing] laundry."  (R. 27).

Claimant's ability to perform these activities to the extent supported by the record does not provide substantial evidence to disregard Dr. Gioia's conclusions, especially without an explanation.  In particular, Claimant's ability to go out by himself without getting lost could simply reflect that he has long-term memory of his neighborhood and where he lives.  As such, his capacity "to go out" does not undercut Dr. Gioia's finding that his short-term memory appears to be impaired.  Similarly, Claimant's ability to play video games for a limited period of time due to migraines (R. 63) or "to follow the hearing and answer questions appropriately" during the portion of the 58 minutes hearing during which he testified does not demonstrate that

he is – contrary to Dr. Gioia's finding[8] – capable of "sustained concentration and persistence." (R. 43, 87); *see, e.g., Cole v. Colvin,* No. 1:14-cv-01195-SEB-MJ, 2015 WL 1885452, at *4 (S.D.Ind. Apr. 23, 2015), *quoting Turner v. Astrue,* 390 Fed.Appx. 581, 584 (7th Cir. 2010) ("the ALJ is prohibited from . . . 'substituting his personal observations for considered judgments of medical professional'"). Finally, the ALJ's reliance on Claimant's ability to prepare food, vacuum, and do laundry ignores the limitations that Claimant had with respect to performing these activities[9] and, once more, fails to squarely contradict Dr. Gioia's findings and provide substantial evidence to disregard them.

The Commissioner further defends the ALJ's decision based on the relation between Dr. Gioia's opinion and Dr. Gilyot-Montgomery's less favorable report. The ALJ adopted Dr. Gilyot-Montgomery's report and – although the ALJ did not mention this fact – she had access to Dr. Gioia's evaluation because it pre-dated her assessment. The Commissioner cites *Frank B. v. Saul*, No. 18 C 2099, 2019 WL 6307651, at *8 (N.D.Ill. Nov. 25, 2019) for the proposition that an ALJ can rely on the opinion of a non-examining expert like Dr. Gilyot-Montgomery when she has reviewed the report of a consulting expert like Dr. Gioia.

The Court does not find that this reasoning applies to the facts of this case. It is undisputed that an ALJ can favor a non-examining source over a consulting expert if the record supports such a finding. *Young*, 362 F.2d at 1002. That is not the issue at hand, however;

---

[8] The Court notes that Dr. Gioia's finding in this regard is consistent with Dr. Gilyot-Montgomery's finding – which the ALJ expressly adopted – that he has "moderate limitation[s] in attention and concentration for extended periods." (R. 27).

[9] For example, Claimant testified that he could vacuum "from time to time" and that his food preparation only involved Ramen noodles or heating frozen meals. (R. 59, 364). Claimant's mother also testified that she had to remind him continually to finish things or "he'll forget he's doing it." (R. 73). The ALJ was obligated to address all of the relevant things that Claimant said about his activities before he could cite them as evidence that Claimant was less restricted than Dr. Gioia stated.

Claimant's point is that the ALJ was first required to properly *evaluate* Dr. Gioia's report and to assign it a weight under the guidelines set out in the regulations. It is well established that the failure to properly explain the reasons for the weight given to an expert report constitute reversible error. *See Blakley v. Comm. of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) ("[A]n ALJ's failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given *denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record") (internal quotes and citation omitted) (emphasis in original).

The Commissioner fails to consider that *Frank B*. does not contradict that claim. The ALJ in that case favored the report of a non-examining doctor over the more restrictive findings of an examining expert. Unlike here, however, the ALJ in *Frank B.* evaluated the examining expert's report and gave it "some" weight. *Frank B.*, 2019 WL 6307651, at *8. The issue in *Frank B*. was whether the ALJ had adequately explained her reason for this weighting and for favoring the report of the non-examining expert. That does not arise here because the ALJ did not address many of the findings in Dr. Gioia's report and, more importantly,never weighed it. Moreover, the court in *Frank B.* noted that the non-examining expert had carefully addressed the examining source's findings as part of her own analysis. *Id*. By contrast, Dr. Gilyot-Montgomery did not reference anything in Dr. Gioia's report or even mention it in her findings. (R. 163-64, 169).

Finally, the Commissioner argues that an ALJ has the discretion to decide which medical expert to believe. That is also inapposite to Claimant's point. The Court agrees that an ALJ not only can choose to credit one expert over another, he *must* do so when the experts submit conflicting opinions. *See Young*, 362 F.3d at 1001; *Green v. Saul*, 781 Fed.Appx. 522, 528 (7th

Cir. 2019). "Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do." *Lafayette v. Berryhill*, 743 Fed.Appx. 697, 699 (7th Cir. 2018). An ALJ can only carry out that obligation, however, when he has first properly evaluated what the experts have to say, weighed their findings, and built a bridge between the record and his conclusion. The regulations are clear that "[r]egardless of its source, we will evaluate every medical opinion we receive" by applying the factors set out in 20 C.F.R. §404.1527. 20 C.F.R. §404.1527(c). That did not happen here, and remand is required so that the ALJ can consider the issue with greater care.[10]

---

[10] The ALJ should also restate his reasons for adopting Dr. Gilyot-Montgomery's report. The ALJ's stated rationale for doing so was that her report was "well supported by the evidence of the record as a whole." (R. 27). That fails to address any of the factors set out in 20 C.F.R. §404.1527(c) or to tie any part of the record to the psychologist's findings. Dr. Gilyot-Montgomery stated, for instance, that Claimant had a mild limitation in his ADLs. Instead of addressing this issue, the ALJ overlooked much of what Claimant and his mother stated about his daily activities. *See, e.g., supra,* at n.9. The Court also notes that the ALJ failed to address many of the RFC findings that Dr. Gilyot-Montgomery assessed. That led to problems that the ALJ must rectify. For example, Dr. Gilyot-Montgomery stated that Claimant had moderate adaptation restrictions and could only tolerate infrequent workplace changes. (R. 151-52). By contrast, the ALJ concluded in his special technique analysis that Claimant had *no* restrictions in managing or adapting himself. (R. 27). The ALJ could not reasonably adopt Dr. Gilyot-Montgomery's report without explaining the discrepancy between their findings on this issue.

## CONCLUSION

For these reasons, Claimant's motion for summary judgment (Dckt. #15) is granted, and the Commissioner's motion for summary judgment (Dckt. #22) is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) clarify the period for which the RFC applies; (2) fully incorporate Claimant's limitations into his RFC and the hypothetical questions posed to the VE; and (3) evaluate Dr. Gioia's report and assign it a specific weight on the terms set out in this Memorandum Opinion.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: May 5, 2021**